FILED

Dec 31 2018, 7:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James Alvin Trimnell,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 31, 2018

Court of Appeals Case No.
18A-CR-987

Appeal from the Ripley Circuit
Court

The Honorable Ryan King, Judge

Trial Court Cause No.
69C01-1711-MR-002

**Darden, Senior Judge.**

## Statement of the Case

James Alvin Trimnell brings this interlocutory appeal from the trial court's order denying his motion to dismiss a charge of felony murder.[1] We reverse and remand.

## Issue

Trimnell raises the following issue for our review which we restate as: whether, in this particular case, the trial court abused its discretion by denying his motion to dismiss and "holding that the felony murder statute applies to the person who delivers a narcotic drug to another person who later administers the narcotic drug to another person who subsequently dies."

## Facts and Procedural History

The factual allegations contained in the charging information and the supporting probable cause affidavit follows. Trimnell knew Rachel and Nathaniel Walmsley because they had previously worked together. It appears that in the past, and on occasion, Trimnell had used drugs with Nathaniel and Rachel. Nathaniel had purchased drugs from Trimnell on six or seven occasions prior to the incident in question. Nathaniel would contact and tell Trimnell what drugs he wanted and in what quantity and would provide Trimnell the money for the purchase.

---

[1] Ind. Code § 35-42-1-1(3)(A) (2017).

[4] On July 30, 2017, Nathaniel sent a text message to Trimnell, stating that he wanted a "G" for "100". Appellant's App. Vol. 2, p. 13. Nathaniel only asked Trimnell to purchase the drug because he had already stolen a clean needle from a client. Nathaniel and Rachel had planned a family barbecue for that afternoon and evening.

[5] It is undisputed that at some point between 1:00 and 3:00 p.m. that day, Trimnell arrived at Nathaniel's home and delivered one half gram to a gram of a substance to Nathaniel in a cigarette package and went home. Trimnell subsequently told police officers that he had bought the substance in Cincinnati, Ohio at a location off the Mt. Healthy exit. He also stated that he believed the substance he purchased was heroin.

[6] Apparently, Rachel had been drinking alcohol excessively on the day of the incident. At around 3:45 to 4:00 p.m. that same day, Nathaniel "cooked the drug" and injected Rachel, as he was the one who always administered drugs to Rachel. *Id.* Nathaniel, subsequent to being questioned by law enforcement, acknowledged that he had also administered the same drug to himself, and recalled seeing Rachel lying on the bathroom floor and thought that she was probably dead. However, he was not certain because he could not detect any vital signs. Rachel seemed to be passed out, had a weak pulse and her breathing was shallow. He and his fifteen-year-old son later carried Rachel upstairs to her bed.

[7] Nathaniel then took the needle he had used out of the top drawer of the dresser, cut it up, and disposed of the pieces in the woods near his home. He also disposed of a second needle he possessed. He then flushed the remainder of the drug down the toilet.

[8] Nathaniel's mother had arrived at the house for the family barbecue around 5:00 p.m. and thought that Rachel was taking a nap. Nathaniel's father arrived sometime after her. Nathaniel's mother told an officer that at around 8:15 p.m. that evening she became aware that Nathaniel and his son had loaded Rachel in the car so Nathaniel could take her to Margaret Mary Hospital. She stated that Rachel did not appear to be conscious when she observed them place her in the car. An apparent drug overdose was reported to police at around 8:37 p.m. that evening by Margaret Mary Hospital. Rachel had died at the hospital that evening and during an autopsy the following day, her cause of death was determined to be "acute fentanyl and ethanol intoxication." *Id.* at 13.

[9] Nathaniel consented to a search of his residence. Officers located a wooden box in the bathroom closet. Inside the box was a spoon with burn marks on the bottom and residue in the "scoop part of the spoon." *Id.* at 12.

[10] On November 9, 2017, the State charged Trimnell with felony murder. On December 29, 2017, Trimnell filed a motion to dismiss and a hearing was held on the motion. The trial court took the motion under advisement and later denied it on March 19, 2018. At the request of both parties, the trial court

certified its order for interlocutory appeal. This court accepted jurisdiction of the appeal.

## Discussion and Decision

### Standard of Review

In *State v. Thakar*, our Supreme Court set forth the appropriate standard of review as follows:

> We review a trial court's ruling on a motion to dismiss a charging information for an abuse of discretion . . . [and a] trial court [] abuses its discretion when it misinterprets the law. A challenge to the constitutionality of a statute is a pure question of law, which we review *de novo*. [A]ll statutes are presumptively constitutional, and the court must resolve all reasonable doubts concerning a statute in favor of constitutionality. That being said, unlike the higher burden faced by those making a facial constitutional challenge, those challenging the statute as applied need only show the statute is unconstitutional on the facts of the particular case.

82 N.E.3d 257, 259 (Ind. 2017) (internal quotations and citations omitted).

Generally, when a defendant files a motion to dismiss an information, the facts alleged in the information are to be taken as true. *State v. Gill*, 949 N.E.2d 848, 850 (Ind. Ct. App. 2011). Questions of fact to be decided at trial or facts constituting a defense are not properly raised by a motion to dismiss. *Id.* The hearing held on a motion to dismiss is not a trial of the defendant on the offense charged. *Id.*

## Felony Murder Statute

[13] The version of the felony murder statute in effect at the time of the alleged offense provided in pertinent part as follows:

> A person who [] kills another human being while committing or attempting to commit [] dealing in or manufacturing cocaine or a narcotic drug (IC 35-48-4-1) [] commits murder, a felony.

Ind. Code § 35-42-1-1(3)(A). Heroin is a schedule I controlled substance. Ind. Code § 35-48-2-4(c) (2017). Fentanyl is a schedule II controlled substance. Ind. Code § 35-48-2-6(c) (2015).

## Controlling Precedent

[14] Trimnell argues that the trial court abused its discretion by denying the motion to dismiss because the facts alleged in the information, if taken as true, do not establish that he committed the criminal offense of felony murder. The State contends that the trial court's denial of the motion to dismiss was proper because of controlling precedent announced in *Duncan v. State*, 857 N.E.2d 955 (Ind. 2006), and *Layman v. State*, 42 N.E.3d 972 (Ind. 2015).

[15] In *Duncan*, *supra*, Duncan lived in an apartment in Lafayette with her son, Lindsey and his fiancé Green, along with the couple's infant child and Green's two-year-old son. Duncan had moved in to assist the couple with child care. Duncan had a prescription for methadone, which she testified was to control pain associated with her physical ailments.

[16] On an occasion, Duncan was home alone with the two children. She gave Green's two-year-old child one-fourth of one of her methadone tablets. The child died the next day from methadone poisoning. Ultimately, Duncan confessed to giving methadone to the child, but then moved to suppress the confession on various grounds after being charged with felony murder among other offenses. The confession was admitted at trial, and the jury found Duncan guilty of felony murder and other crimes.

[17] On appeal, in addition to other issues, Duncan challenged the sufficiency of the evidence supporting her conviction for felony murder. The Supreme Court noted and addressed at the outset that among the statutory definitions of felony murder was the killing of another human being while committing or attempting to commit dealing in a schedule II controlled substance. *Duncan*, 857 N.E.2d at 957. The Court also observed that methadone is a schedule II substance and that the statutory definition of dealing includes possession with the intent to deliver a schedule II controlled substance to a person under eighteen years of age at least three years junior to the person. *Id.* Therefore, her possession of methadone with the intent to give it to a two-year-old child constituted dealing. *Id.*

[18] Duncan first argued that the evidence was insufficient to establish that the two-year-old's death occurred during the commission of the dealing offense. She claimed that because the child died a day after the delivery of methadone, he was not killed during the felony. Duncan acknowledged the Court's precedent, holding that if an injury inflicted during the commission of a felony contributes

"mediately or immediately" to the death of the victim, the defendant's conviction for homicide could be affirmed. *Id.* at 958. However, she contended that there was no injury inflicted on the child in the course of the dealing because the child was not immediately harmed by the pill. She further argued that the moment she gave the pill to the child, she no longer possessed the requisite intent for the crime. Rejecting this argument, the Court held that the injury to the child was ingesting a controlled substance, which led directly, if not immediately, to the child's death. *Id.* The dealing was the first step in the chain of events leading to the child's death. *Id.* Consequently, the killing occurred during the felony even though the child survived for a period of time after the injury. *Id.*

[19] Next, Duncan argued that the child's death was not a foreseeable consequence of her act. Rejecting that contention as well, the Court observed that the child's death was not so extraordinary that it would be unfair to hold Duncan responsible for the death. *Id.* "Duncan administered a prescription drug–indeed a schedule II controlled substance–to a two-year old with no prescription and no medical advice. Harmful consequences, including death, are not outside the range of predictable results." *Id.*

[20] In *Layman*, *supra*, the Court analyzed a conviction of felony murder imposed on two juvenile defendants charged as adults. A group of unarmed juveniles who had decided to burglarize a house they believed was unoccupied at that time enlisted the help of two other unarmed young adults to break into the home. The group did not realize that the homeowner was asleep in his upstairs

bedroom. When he awakened and heard the commotion downstairs, he grabbed his handgun and cell phone and loudly ran downstairs. He encountered the defendants, and fired his handgun, ultimately killing one of the young adult perpetrators.

[21] The State charged Layman with felony murder for the death of his friend. After a jury trial, Layman was found guilty as charged. On appeal, Layman and another juvenile defendant argued that the felony murder statute was incorrectly applied to their cases. One of the arguments that had not been waived was framed by the Supreme Court as a challenge to the sufficiency of the evidence. *Layman*, 42 N.E.3d at 978. "The essence of their argument is that the death of their friend and co-perpetrator was not reasonably foreseeable." *Id.*

[22] Analyzing precedent in which felony murder convictions were upheld against criminals whose co-perpetrators were killed by someone other than the defendant in the commission of felonies, the Supreme Court concluded that a common thread among those cases was that "an armed defendant engaged in violent and threatening conduct," acting either as a principal or an accessory, resulting in the "mediate or immediate cause of a co-perpetrator's death." *Id.* at 979. The Court further noted that there "was simply nothing about the Appellants' conduct or the conduct of their cohorts that was 'clearly the mediate or immediate cause' of their friend's death." *Id.* at 979-80 (quoting *Palmer v. State*, 704 N.E.2d 124, 126 (Ind. 1999)). The convictions were

reduced to burglary convictions and remanded with instructions to sentence the defendants accordingly.

## Application of Precedent to this Appeal

[23] In this appeal, the facts alleged in the information, if taken as true, establish that on the date of the incident Nathaniel, via text, asked Trimnell to obtain a "G" for "100", meaning the quantity of and amount of payment for the purchase of drugs. Nathaniel gave Trimnell the money to buy the drugs and Trimnell bought and delivered them to Nathaniel. It is also undisputed that on this occasion, Trimnell, who had made drug purchases for Nathaniel on six or seven previous occasions, delivered around a gram of what he believed to be heroin to Nathaniel at Nathaniel's home sometime between 1:00 and 3:00 p.m. and then went home.

[24] Later, at around 3:45 p.m. or 4:00 p.m., Nathaniel decided to cook the drug and injected the drug into Rachel and then into himself. This time, Rachel became unresponsive, seemed to be passed out, had developed a weak pulse, and her breathing became shallow. Nevertheless, Nathaniel and his fifteen-year-old son later carried Rachel upstairs to her bed. At around 8:15 p.m. that evening, Nathaniel and his son then put Rachel into a car so that Nathaniel could take her to the hospital. At around 8:37 p.m. hospital employees notified law enforcement of a possible drug overdose. By the time law enforcement arrived at the hospital, Rachel had died, and a subsequent autopsy revealed that she died from acute fentanyl and ethanol intoxication.

[25]    The *Duncan* case, *supra*, involved the statutory definition of felony murder involving killing another human being while committing or attempting to commit dealing in a schedule II controlled substance. In that case, the statutory definition of dealing included possession with the intent to deliver a schedule II controlled substance to a person under eighteen years of age at least three years junior to the person. Precedent established that if an injury inflicted during the commission of a felony contributes "mediately or immediately" to the death of the victim, the defendant's conviction for homicide could be affirmed. The Court held that the injury to the two-year-old child was ingesting a controlled substance, which led directly, if not immediately, to the child's death; the dealing was the first step in the chain of events leading to the child's death; and, consequently, the killing occurred during the felony even though the child survived for a period of time after the injury.

[26]    In essence, the State contends that Trimnell's delivery of the heroin to Nathaniel was the first step in the chain of events leading to Rachel's death, and that the killing occurred during the felony even though it happened after he had left the house and was nowhere around. We believe that this stretches the holding in *Duncan* too far. Although harmful consequences, including death, are not outside the range of predictable results from delivering controlled substances to another, Rachel's death was caused by the combination of acute fentanyl and ethanol intoxication. There is no indication in the record that Trimnell knew how much of the drug would be injected by Nathaniel in Rachel's arm, or when or how frequently they would be using the drug he had

delivered and that Rachel had been acutely intoxicated by alcohol for a period of time prior to using the drug.

[27] Further, Trimnell had delivered drugs to Nathaniel on at least six or seven occasions prior to Rachel's death. Using the Court's rationale in *Layman*, there was nothing about Trimnell's conduct that was clearly the mediate or immediate cause of Rachel's death. Trimnell could not have anticipated or reasonably foreseen that Rachel would become acutely intoxicated with alcohol prior to or during the time that Nathaniel injected the drug in Rachel's arm. Likewise, Trimnell could not have anticipated or reasonably foreseen that Nathaniel would not promptly seek medical attention when it became obvious that Rachel became unconscious, she was unresponsive and suffered difficulty breathing, but waited until hours later in an to attempt to obtain medical treatment for her. Furthermore, Trimnell could not have foreseen how much of the drug Nathaniel would inject in Rachel's arm. We agree with Trimnell that the trial court abused its discretion in denying the motion to dismiss the felony murder charge by misapplying the law to the facts and circumstances in this case.[2]

---

[2] We acknowledge that both parties have presented arguments addressing the issue whether the felony murder statute is unconstitutionally vague as applied to the facts of this particular case. The doctrine of judicial restraint persuades us to avoid a constitutional analysis when we can exhaust other options, such as statutory interpretation and analysis of common law, to dispose of the issue or issues. *See Edmonds v. State*, 100 N.E.3d 258, 262 (Ind. 2018). Therefore, we do not address the constitutional arguments. We further acknowledge that the parties have discussed how the legislature's enactment of a new law, Indiana Code section 35-42-1-1.5 (2018), allowing defendants to be charged with dealing in controlled substances resulting in death as a Level 1 felony, reflects on legislative intent vis-à-vis the application of a felony murder charge

# Conclusion

Based on the foregoing, we reverse the decision of the trial court and remand for proceedings consistent with this opinion.

Reversed and remanded.


Vaidik, C.J., concurs in result with opinion.

Pyle, J., concurs.

---

for an overdose death. We decline to address this argument, relying instead on our analysis of case law and the felony murder statute itself.

James Alvin Trimnell,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

Court of Appeals Case No.
18A-CR-987

**Vaidik, Chief Judge, concurring in result.**

[30]    I reach the same result as the majority but for a different reason.  I base my opinion on the facts agreed to by the parties.  Namely, Trimnell delivered drugs to the Walmsley home and left.  Rachel later consumed the drugs at home and died of an overdose.[3]  I conclude that the felony-murder statute, as a matter of law, cannot apply when a killing occurs after—not during—the delivery of drugs.

[31]    A person who "kills another human being while committing" dealing in a narcotic drug (Schedule I or II) commits felony murder.  Ind. Code § 35-42-1-

---

[3] Trimnell's motion to dismiss the felony-murder charging information asserted that the facts stated did not constitute an offense.  Appellant's App. Vol. II p. 62 (citing Ind. Code § 35-34-1-4).  It is only when an information is facially deficient in stating an alleged crime that dismissal for failure to state an offense is warranted.  *Gutenstein v. State*, 59 N.E.3d 984, 994 (Ind. Ct. App. 2016), *trans. denied*.  Nevertheless, the parties agree to the basic underlying facts of this case.  In the interest of judicial economy, I address the issue.

1(3). A person "kills" another human being when they put into motion the death. *Duncan v. State*, 857 N.E.2d 955, 958 (Ind. 2006). The Indiana Supreme Court addressed what it means to kill a person "while committing" a designated felony in *Eddy v. State*, 496 N.E.2d 24 (Ind. 1986). In that case, the defendant argued that the offense of felony murder required the killing to occur **before** all the statutory elements of robbery were complete. The Court rejected this argument, finding that "a homicide committed within the res gestae of the felony charged is committed in the commission or perpetration of a felony." *Id.* at 28; *see also Bissot v. State*, 53 Ind. 408, 413 (1876) ("[W]here the homicide is committed within the res gestae of the felony charged, it is committed in the perpetration of, or attempt to perpetrate, the felony, within the meaning of the statute[.]"). In other words, the Court found that a crime that is continuous in its purpose and objective is deemed to be a single uninterrupted transaction and that "[a] homicide and [underlying felony] are deemed to be one continuous transaction when they are closely connected in time, place, and continuity of action." *Eddy*, 496 N.E.2d at 28. Applying the law to the facts, the Court concluded that the homicide and robbery were one continuous transaction because the defendant forcibly removed the first victim's wallet before the killing of the second victim "but prior to the asportation of this property." *Id.*

[32] There has been only one Indiana case applying the felony-murder statute to a drug-overdose death, *Duncan*. In that case, the defendant had a prescription for methadone. She gave 1/4 of a tablet to Noah, a two-year-old in her care, and Noah died the next day from methadone poisoning. The State charged the

defendant with, among other things, felony murder, and the jury found her guilty.

[33] The defendant appealed, arguing that the evidence did not support her felony-murder conviction because Noah died the day after she gave him the methadone. Although the opinion turned on when the "death" occurred as opposed to when the "killing" occurred, our Supreme Court affirmed the defendant's felony-murder conviction. In doing so, the Court noted that it was "only through a series of stretches that her conduct [fell] under the murder statute." *Duncan*, 857 N.E.2d at 960.

[34] *Duncan* is not controlling here. In that case, the defendant administered methadone to a two-year-old, and the defendant's administration of the drug to the toddler was both the dealing and the killing.[4] As such, the killing and the dealing were closely connected in time, place, and continuity of action and, therefore, were one continuous transaction. Here, however, Trimnell did not administer the drugs to Rachel; rather, he dropped off the drugs and left. At this point, the transaction was completed. It was not until later, when Rachel consumed the drugs, that the killing occurred. The killing and the dealing were separated by time and continuity of action. Therefore, I would hold that, as a

---

[4] Rachel's husband, Nathaniel, was also charged with felony murder. He filed a motion to dismiss the charge, which the trial court denied. Nathaniel's interlocutory appeal is currently pending before this Court. *See* 18A-CR-02506. I express no opinion as to whether Nathaniel's act of administering the drugs to Rachel constitutes dealing or felony murder.

matter of law, the felony-murder statute does not apply here because the killing did not occur while the underlying felony of dealing was committed.

[35] Finally, to the extent my view of the felony-murder statute means that dealers will escape punishment when their customers die from an overdose, the Indiana General Assembly addressed this when it enacted Indiana Code section 35-42-1-1.5 (effective July 1, 2018). Section 35-42-1-1.5 establishes the new offense of dealing in a controlled substance resulting in death, which does not require the killing to occur during the drug delivery:

> (a) A person who knowingly or intentionally manufactures or delivers a controlled substance or controlled substance analog, in violation of:
>
> (1) IC 35-48-4-1 (dealing in cocaine or a narcotic drug);
>
> (2) IC 35-48-4-1.1 (dealing in methamphetamine);
>
> (3) IC 35-48-4-1.2 (manufacturing methamphetamine); or
>
> (4) IC 35-48-4-2 (dealing in a schedule I, II, or III controlled substance);
>
> that, when the controlled substance is used, injected, inhaled, absorbed, or ingested, results in the death of a human being who used the controlled substance, commits dealing in a controlled substance resulting in death, a Level 1 felony.

For these reasons, I join in the reversal of the trial court's denial of Trimnell's motion to dismiss the felony-murder charging information.